IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHARLES SHEPPARD,

                Plaintiff

    v.

OFFICER SCHULTZ, *et al.*,

                Defendants.

OPINION AND ORDER

14-cv-797-slc

---

CHARLES SHEPPARD,

                Plaintiff

    v.

BLOYER, *et al.,*

                Defendants.

ORDER

14-cv-863-slc

---

Pro se plaintiff Charles Sheppard is proceeding in Case. No. 14-cv-797-slc on claims that Officer Tarah Schultz, Judy Schaefer, Dr. Paul Sumnicht and Belinda Schrubbe violated his rights under the Eighth Amendment and state law by denying him his prescription seizure medication and causing him to suffer severe seizures and injury. Defendants filed a Motion for Summary Judgment in that case (dkt. 50).

In Case No. 14-cv-863-slc, Sheppard is proceeding on claims that prison staff ignored his threats of self-harm. That case is proceeding to trial. In both cases, Sheppard filed motions for assistance in recruiting counsel.

For the reasons stated below, I am denying the motion for summary judgment in Case No. 14-cv-797-slc, granting Sheppard's requests for assistance in recruiting counsel in both cases for the purpose of attempting a global mediated settlement, and striking all remaining dates in both cases, to be reset once counsel has been recruited.

UNDISPUTED FACTS[1]

I.  The Parties

Sheppard was an inmate at Waupun Correctional Institution (Waupun) during all times relevant to this lawsuit.  Defendants were Waupun employees during this time: Dr. Paul Sumnicht was a physician; Belinda Schrubbe (who is a registered nurse) was Waupun's Health Services Unit (HSU) manager and supervisor of Waupun's nursing staff; Judy Schaefer was an HSU nurse; and Tarah Schultz was a correctional officer.

II.  Dr. Sumnicht's Order to Stop Carbamazepine Prescription

On September 26, 2011, Sheppard was placed in Temporary Lockup (TLU) in Waupun's segregation unit.  When an inmate is placed in TLU, someone on the nursing staff reviews the inmate's medications and then reissues these medications to the TLU.  Pursuant to this practice, a nurse inspected the bag of medications that accompanied Sheppard to the TLU, listed the type and quantity of each medication in Sheppard's medical chart, then flagged this list for review by Dr. Sumnicht.  According to this list, Sheppard's medication bag contained 67 carbamazepine pills, which were prescribed to Sheppard to control his seizures.  (Ex. 1000 to Sumnicht Decl., dkt. 53-1, at 18.)  Sheppard disputes that all the pills were his because the nurse's note did not explicitly state that the "bag" of pills was his, and because he claims that all the pills never were actually found in his possession.  (Sheppard Decl., dkt. 65, ¶ 68.)

---

[1]  Unless otherwise noted, these facts are material and undisputed.  The facts are drawn from the defendants' proposed findings of fact, as well as underlying evidentiary support submitted by both sides, viewed in the light most favorable to Sheppard.

On September 30, 2011, Dr. Sumnicht reviewed the nurse's note. At 1:00 that afternoon, Dr. Sumnicht discontinued Sheppard's carbamazepine prescription. Dr. Sumnicht did not speak to or examine Sheppard before canceling this prescription. Dr. Sumnicht canceled Sheppard's prescription because he believed Sheppard was hoarding his medications and faking his seizures. He came to this conclusion, in part based on his experience as a doctor, but also on: (1) a conversation he remembers having had with HSU manager Schrubbe, and (2) his review of Sheppard's Seizure Flow Sheet, a record that Dr. Sumnicht created in June of 2011 to track Sheppard's seizure history and treatment plan. (Sumnicht Decl., dkt. 53, ¶¶ 7, 10, 11.)

In Dr. Sumnicht's experience, inmates hoard medications for a number of reasons, and it is not uncommon for inmates to feign illness to obtain medications. Dr. Sumnicht does not claim to have experience assessing whether inmates actually are hoarding, and he does not claim to have knowledge about how other staff members collect and transfer medications when inmates are transferred from their regular unit to TLU. Rather, Dr. Sumnicht states that after he reviewed the nurse's note about Sheppard, he had a discussion with Schrubbe about the significance of the note, and this conversation led him to conclude that Sheppard had been hoarding several of his medications, including the carbamazepine. (*Id.*, dkt.53, ¶ 6.) Dr. Sumnicht's declaration does not describe the details of this conversation, but he stated in a discovery response that Schrubbe told him that Sheppard "indicated that he did not really need doses of Carbamazepine because he was not taking them." (*See* PPFOF, dkt. 73, at 30-31.)

Sheppard disputes that this conversation took place, citing to defendants' discovery responses in which Schrubbe stated that she does not deny that the conversation took place but cannot recall the conversation and only investigated Sheppard's medication after he filed a

grievance about the incidents leading up to the discontinuation of his medication. (Def.'s Resp. to Pl. Second Request for Interrogs., dkt. 65-32, at 6.)

Sheppard's Seizure Flow Sheet, which Dr. Sumnicht reviewed, includes: (1) a note stating "2005 - Neurology - most likely pseudo seizure"; (2) a comment that Sheppard suffered a seizure in 2007; and (3) a note that Sheppard was receiving 400 mg of carbamazepine to treat his seizures. (Ex. 1 to Sumnicht Decl., dkt. 53-1, at 1.) Dr. Sumnicht explains that a pseudo seizure is a seizure-like episode that is not epileptic in nature, but can be difficult to diagnose because the patient either could be faking seizure-like symptoms or actually could be experiencing unexplained but actual neurological symptoms. Dr. Sumnicht further explains that, although seizure medication likely is not appropriate if a patient is faking seizure symptoms, "seizure medication may be appropriate for a patient who has real seizure symptoms." (Sumnicht Decl., dkt. 53, ¶ 9.)

III.    Sheppard's Requests for Carbamazepine

On the evening of October 4, 2011, a few days after Dr. Sumnicht cancelled the prescriptions, Officer Schultz conducted a medication pass in TLU, and Sheppard asked Schultz for his seizure medication. Schultz does not recall the details of the conversation; Sheppard claims that she told him that the medication had been discontinued, it wasn't her problem, and she did not have time to call HSU for him. According to Sheppard, he responded "Can you please get a nurse down here or call a doctor cause that's a huge mistake because I've been taking these meds for years and there's no way that they'd discontinue them without me being examined or notified, or having a replacement in place." (Sheppard Decl., dkt. 65, ¶ 2.) Again,

4

Schultz does not remember how she responded to this; Sheppard states that she still refused to

contact HSU on his behalf.

After Schultz left, Sheppard pushed his medical alert button and was told to talk to an

officer, so Sheppard again called Schultz. Sheppard claims that she ignored him at first, but then

came to his cell, at which point he told her that he had not taken his seizure medication in over

24 hours, that he could not afford to miss taking them, and that he was already not feeling well.

(*Id.* ¶¶ 4-5.) Once again, Schultz did not call HSU on his behalf or take any other action on his

behalf.

As a correctional officer, Schultz's authority was limited to distributing medications as

directed by the medication log created by HSU. The standard practice when an inmate believes

that a medication has been improperly discontinued is for the correctional officer to offer the

inmate an HSU request form and to direct the inmate to HSU for help. Schultz states that she

did not believe an HSU request form would have helped Sheppard because only a doctor could

change his prescription, and the only medical personnel available at that time of day were nurses.

Sheppard did not have any other interactions with Schultz that night or the next morning.


## IV. Sheppard's Seizures and Follow-up Treatment

At 11:00 a.m. on October 5, 2011, Sheppard suffered a seizure. According to Sheppard,

he lost consciousness and hit his head against concrete. When he woke up, C.O. Fischer was

present and asking him if he was okay. Fischer and other correctional officers escorted Sheppard

to an exam room. Nurse Schaefer evaluated Sheppard at 11:10 a.m. and reported the event as

an "unwitnessed seizure." Sheppard disputes this, claiming that Officer Fischer told Schaefer that

he saw Sheppard seize for at least three minutes and that Sheppard hit his head on the ground. Schaefer does not recall hearing the officer who brought Sheppard to the examination room tell her this. Schaefer then told Sheppard that she would check into restarting his seizure medication. Sheppard was escorted back to his cell without receiving any carbamazepine or further attention from Schaefer. As he was leaving the room, Sheppard nearly fell and required the help of the officers to get back to his cell.

At 11:45 a.m. that same day, Dr. Sumnicht restarted Sheppard's carbamazepine prescription, coding his order with a "1" and a circle around it, which indicates that the order should be processed as soon as "reasonably possible." Schaefer processed the order at 12:00 p.m. that day, but Sheppard did not receive the dose at that point.

At 12:50 p.m. still on October 5, 2011, an officer brought Sheppard to Schaefer because Sheppard had pushed the medical alert button and complained about not receiving his seizure medication. Schaefer telephoned Dr. Sumnicht, who ordered that Sheppard receive one dose of carbamazepine "now" – which apparently means as soon as "reasonably possible" – and that Sheppard receive a second dose at bedtime to increase his blood level of carbamazepine. Schaefer entered Dr. Sumnicht's order into Sheppard's medical chart.

According to Schaefer's declaration, the appearance of her initials on Sheppard's Medication/Treatment Record two rows above the "HS" ("bedtime") row indicates that she gave Sheppard his first dose of carbamazepine the afternoon of October 5, 2011, but the note does not indicate what time she provided it. (Schaefer Decl., dkt. 55, ¶¶ 15-17; Schaefer Decl. Ex.,

6

dkt. 55-1, at 1.) Sheppard disputes this, averring that Schaefer never gave him a dose of carbamazepine on October 5. (Sheppard Decl., dkt. 65, ¶¶ 7-9, 60.)[2]

Sheppard suffered a second seizure at approximately 8:00 p.m. on October 5, 2011. After this seizure, a nurse Larson (not a party to this lawsuit), evaluated Sheppard. At 8:30 p.m. Larson administered him some carbamazepine, but the parties dispute how much. While defendants claim that the medical records show that Sheppard only received one dose in the evening because he received the first dose in the afternoon, Sheppard remembers receiving one dose when Larson first treated him, and a second dose five minutes after he was returned to his cell. (Sheppard Decl., dkt. 65, ¶¶ 8-9.) After October 5, Sheppard continued taking carbamazepine as it had been prescribed prior to September 30. Sheppard did not have any more seizures.

It is unclear when Dr. Sumnicht learned of Sheppard's second seizure, but he did order head and neck scans, which were taken on October 7, 2011, and showed nothing abnormal. Dr. Sumnicht did not personally examine Sheppard until October 12, 2011. At that point, Dr. Sumnicht prescribed pain medication and a muscle relaxer to address Sheppard's headaches and other pain he was experiencing due to the seizures. (Ex. to Sumnicht Decl., dkt. 53-1, at 19.)

---

[2] Sheppard claims that Schaefer "falsified" his medical records, and he has leveled other accusations of falsehood in his filings. Sheppard has submitted no evidence to support his accusations beyond his own differing recollection of events. For the purposes of summary judgment, it is enough for the court to note that the parties dispute material facts.

OPINION

I permitted Sheppard to proceed on Eighth Amendment deliberate indifference and Wisconsin negligence and malpractice claims against Schultz, Schaefer, Dr. Sumnicht, and Schrubbe. The Eighth Amendment of the United States Constitution requires the state to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, thereby constituting an "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle*, 429 U.S. at 104). Defendants do not dispute that Sheppard's need for carbamazepine constitutes a serious medical need. They argue instead that Schultz and Schaefer were neither deliberately indifferent nor negligent, and that Dr. Sumnicht and Schrubbe were not deliberately indifferent to Sheppard's need for his medication. Defendants argue in the alternative that they are entitled to qualified immunity.

Deliberate indifference constitutes more than medical malpractice; the Eighth Amendment does not codify common law torts. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."). In particular, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters,* 111 F.3d 1364, 1374 (7th Cir. 1997). While deliberate indifference requires more than negligent acts, it also involves something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to

8

inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id*. at 837. A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

Allegations of delayed care may rise to the level of an Eighth Amendment violation if the delay caused the inmate's condition to worsen or unnecessarily prolonged his pain. *Estelle*, 429 U.S. at 104-05; *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted). Even a few days' delay in addressing a severely painful, but readily treatable condition suffices to state a claim for purposes of the Eighth Amendment. *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011).

The Wisconsin standard for negligence is less rigorous, requiring a showing of (1) a duty of care, (2) a breach of that duty, (3) a causal connection between the breach and the plaintiff's injury, and (4) actual loss or damage resulting from the injury. *Brenner v. National Cas. Co.*, 2015 WI App 85, ¶ 19, 365 Wis. 2d 476, 872 N.W.2d 124. Because the record before the court requires a trial on both the deliberate indifference and the negligence claims against each defendant, my analysis will focus on the more demanding Eighth Amendment standard.

## I. Officer Schultz

Officer Schultz does not remember the details of her interaction with Sheppard. Instead, defendants' position is that Officer Schultz's regular practice would have been to respond to Sheppard's October 4 requests for carbamazepine by telling him to submit a written request to HSU. Officer Schultz opines, however, that filling out an HSU request form at that time of day would not have helped Sheppard. Sheppard provides a different version of events, claiming that he told Officer Schultz repeatedly that he was feeling ill and needed to take his carbamazepine, but that Schultz told him that she did not have time to call HSU for him. At the summary judgment stage, the court cannot choose between competing sworn statements about what happened. If a jury were to accept Sheppard's version of events, then the jury could conclude that Schultz's failure to take *any* action amounts to deliberate indifference.

This is so even though Officer Schultz is not a medical professional. Prison staff may be held liable under the deliberate indifference doctrine in a situation where it would be clear even to a nonprofessional that the prisoner is not receiving adequate care. *Hayes v. Snyder*, 546 F.3d 516, 527-28 (7th Cir. 2008) ("[N]on-medical defendants [are] entitled to rely on the professional judgment of medical prison officials" so long as nothing makes it obvious that the care prisoners are receiving is inadequate). Sheppard's sworn statement claims that Officer Schultz refused to take any action even though Sheppard told that he felt sick and needed his seizure medication right away. If a jury were to accept Sheppard's version of events, then the jury could conclude that Schultz acted unreasonably when she failed to alert *any* medical

personnel about Sheppard's complaints. Accordingly, I am denying defendants' motion as to Schultz.

## II.     Nurse Schaefer

Schaefer acted appropriately when she called Dr. Sumnicht on October 5 to report that Sheppard suffered a seizure and needed his medication. Even so, I cannot grant summary judgment in her favor because Sheppard's version of events creates a factual dispute about whether Schaefer actually gave him his first dose of carbamazepine as she claims. Further, a jury–with the benefit of hindsight–could conclude that Schaefer's decision not to monitor Sheppard after his first seizure demonstrated deliberate indifference to Sheppard's medical needs that afternoon and evening.

Defendants claim that Schaefer gave Sheppard carbamazepine on the afternoon of October 5. Sheppard disputes this, averring that Schaefer never gave him carbamazepine on October 5, even though she was aware of Dr. Sumnicht's two orders directing that Sheppard receive a dose as soon as reasonably practicable. Sheppard claims that a different nurse gave him his first dose of carbamazepine on October 5, but not until after he had suffered a second seizure. Thus, there is a genuine dispute whether Schaefer provided carbamazepine to Sheppard on October 5.

Moreover, Sheppard has asserted that Schaefer mishandled Sheppard's examination following his first seizure. Although Schaefer does not remember this, Sheppard claims that Fischer told Schaefer that he saw Sheppard hit his head and seize for three minutes. Sheppard claims that Schaefer sent him back to his cell after examining even though he almost fell and

11

required assistance from the officers escorting him. These assertions, if accepted by a jury, would allow the inference that Sheppard may have suffered a concussion and his condition was observably unstable. If the jury takes this path, then it could conclude that Schaefer should have done more, such as monitoring Sheppard in case of another seizure. Accordingly, I am denying defendants' request for summary judgment as to Schaefer.

## III.    Dr. Sumnicht

The parties do not dispute that Dr. Sumnicht discontinued Sheppard's seizure medication without speaking to or examining Sheppard. A jury will have to evaluate the justifications for this decision because it involves disputed facts. If a jury were to view this interaction/lack of interaction in the light most favorable to Sheppard, then it could conclude that Dr. Sumnicht was deliberately indifferent to Sheppard's medical needs. Let's break it out a bit:

First, with regard to Dr. Sumnicht reading the note about the 67 carbamazepine pills in the bag that accompanied Sheppard to TLU, the parties dispute the facts Dr. Sumnicht relied on to conclude that the note meant that Sheppard was hoarding the pills. While Dr. Sumnicht states that his conversation with Schrubbe led him to conclude that Sheppard was hoarding, Schrubbe doesn't remember speaking with Dr. Sumnicht about this, and the record does not include specific details about this conversation beyond the vague statement that Sheppard "indicated" that he wasn't taking his carbamazepine. Even though Dr. Sumnicht knows that inmates sometimes hoard their medications, he does not have experience identifying signs that an inmate is hoarding medications. True, a cache of 67 pills would be a pretty solid indication

12

of hoarding, but Sheppard claims that the "bag" of pills was never found in his possession, and he alleges that not all of the pills were his. If a jury were to accept Sheppard's claims, then it could conclude that Dr. Sumnicht erred when he conclude that Sheppard was hoarding. Contrariwise, if the jury credits Dr. Sumnicht's version of events–including his conversation about this with Schrubbe–then the jury could conclude that Dr. Sumnicht reached a justifiable conclusion. The bottom line is that a jury will have to see, hear and evaluate the witnesses in order to determine which version of events is more credible.

Second, even if Dr. Sumnicht had a reasonable basis to conclude that Sheppard was hoarding his carbamazepine, there is room to question Dr. Sumnicht's decision to stop the prescription without hearing Sheppard's side of the story. Add to this the fact that Dr. Sumnicht did not examine Sheppard until October 12. Part of the basis for Dr. Sumnicht's decision was the note in the Seizure Flow Sheet that Sheppard "most likely" suffered from pseudo seizures following a 2005 neurology exam. But Dr. Sumnicht knew that (1) a pseudo seizure could involve actual neurological symptoms warranting medication, (2) Sheppard had been consistently prescribed 400 mg of carbamazepine, and (3) the sheet listed a 2007 seizure that was not characterized as a pseudo seizure (*see* Ex. 1 to Sumnicht Decl., dkt. 53-1, at 1). Regardless, Dr. Sumnicht stopped the carbamazepine prescription medication without either running a blood test to confirm that there was no carbamazepine in his system, or conducting *any* contemporaneous examination to assess whether Sheppard was actually faking the symptoms of a seizure.

Dr. Sumnicht personally examined Sheppard on October 12, when he prescribed medications and a muscle relaxer to ease the pain Sheppard was experiencing following his

seizures. Although it is not clear when Dr. Sumnicht learned about the seizures, the head and neck scans that he ordered had taken place on October 7, so Dr. Sumnicht knew about it that day at the latest. Still, Dr. Sumnicht did not personally examine Sheppard for another five days. The fact that Dr. Sumnicht wrote Sheppard a prescription for pain management on October 12 indicates that Sheppard had been suffering pain in the week since the October 5 seizures. Even so, all of this might be within the realm of an acceptable treatment modality, and a jury might be convinced by Dr. Sumnicht's explanation that he was neither deliberately indifferent nor negligent. But that will be the jury's prerogative. The court cannot conclude that Dr. Sumnicht is entitled to judgment as a matter of law. Accordingly, I am denying defendants' request for summary judgment as to Dr. Sumnicht.

IV.    **HSU Manager Schrubbe**

Defendants argue that Schrubbe cannot be held liable for deliberate indifference because she was not involved in the decision to discontinue Sheppard's carbamazepine. Sheppard has responded that Schrubbe should held liable because Dr. Sumnicht claims that she told him that Sheppard indicated to her that he was not taking his carbamazepine. Again, because there is a genuine dispute about whether this conversation occurred, summary judgment is inappropriate.

If Schrubbe *did* have this conversation with Dr. Sumnicht about Sheppard's medications, it would not have taken a giant leap in logic for her to conclude that Dr. Sumnicht would stop his carbamazepine medication. While defendants claim that if this conversation took place, her failure to act could only amount to negligence, I disagree. The record is unclear as to what Schrubbe actually said to Dr. Sumnicht, or whether she actually took any steps to confirm that

14

Sheppard was, in fact, hoarding his carbamazepine. At most, Schrubbe told Dr. Sumnicht that Sheppard was hoarding his pills and did nothing else, such as reviewing his medical records to determine whether he had a history of seizures. On this record, a jury could infer that Schrubbe's failure to confirm that Sheppard was hoarding his carbamazepine constituted deliberate indifference because reporting this conclusion to Dr. Sumnicht without adequately verifying it triggered a foreseeable series of events that could cause–perhaps did cause–Sheppard to suffer seizures unnecessarily. Accordingly, I am denying defendants' request for summary judgment as to Schrubbe.

## V.    Qualified Immunity

Finally, defendants argue that each of them is entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants contend that it was not clearly established that their actions violated plaintiff's rights. That would be true under defendants' version of events. Under Sheppard's version of events, however, the decision to stop his carbamazepine prescription and the timing of restarting his prescription indicate that the defendants ignored the foreseeable risks attendant to stopping Sheppard's seizure medicine, then ignored his reports of seizure symptoms, then responded inadequately and inappropriately to the two seizures that resulted. Sheppard's version of events precludes a finding of qualified immunity as to each of the defendants.

15

**VI.     Renewed Motion for Assistance in Recruiting Counsel or an Expert**

Sheppard has renewed his request for court assistance in recruiting counsel in both of his cases. (Dkt. 75.)  Now that both lawsuits are on course for a jury trial, I conclude that it is time to find a volunteer attorney to assist Sheppard.  I am granting Sheppard's renewed requests, and striking the remaining dates in both schedules.  At this point, I will attempt to recruit one attorney on Sheppard's behalf, for the sole purpose of mediating both cases.  Upon finding a volunteer attorney–which sometimes takes several months–I will set a telephonic scheduling conference.  If mediation does not result in a global settlement of both cases, then I will set a status conference to address next steps.

ORDER

IT IS ORDERED that:

1.     Defendants' Motion for Summary Judgment (dkt. 50), in Case No. 14-cv-797-slc, is DENIED.

2.     Plaintiff Charles Sheppard's motions for assistance in recruiting counsel Case No. 14-cv-797-slc, dkt. 75, and Case. No. 14-cv-863-slc, dkt. 40, are GRANTED.

3.    All deadlines in both cases are STRICKEN.  Upon recruiting an attorney to represent Sheppard, the court will re-set the schedule at a telephonic conference.

Entered this 21st day of April, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge